# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

TASHA M. MCNEIL,

          Plaintiff,

    vs.

UNION PACIFIC RAILROAD COMPANY,

          Defendant.

8:16CV443

MEMORANDUM
AND ORDER

This matter is before the Court on the motion for summary judgment, ECF No. 44, and motion to strike, ECF No. 57, filed by Defendant Union Pacific Railroad Company, and the motion to strike, ECF No 62, filed by Plaintiff Tasha McNeil. For the reasons stated below, Union Pacific's motion to strike will be granted, in part, McNeil's motion to strike will be denied as moot, and the motion for summary judgment will granted.

## FACTUAL AND PROCEDURAL BACKGROUND

Unless otherwise indicated, the following facts are those stated in the parties' briefs, supported by pinpoint citations to admissible evidence in the record, in compliance with NECivR 56.1[1] and Federal Rule of Civil Procedure 56.[2]

---

[1] *See* NECivR 56.1(b)(1):
The party opposing a summary judgment motion should include in its brief a concise response to the moving party's statement of material facts. The response should address each numbered paragraph in the movant's statement and, in the case of any disagreement, contain pinpoint references to affidavits, pleadings, discovery responses, deposition testimony (by page and line), or other materials upon which the opposing party relies. Properly referenced material facts in the movant's statement are considered admitted unless controverted in the opposing party's response.

[2] As stated, the Court's local rules require the party opposing summary judgment to dispute the movant's factual statements by *pinpoint* references to documents *in the record*. McNeil responded to

## I. MCNEIL'S DISPATCHER POSITION

Union Pacific hired McNeil, an African-American female, to work in its Response Management Communications Center (RMCC) as a Critical Call Dispatcher[3] in March of 2012. Supp. Brief ¶ 8, ECF No. 46, Page ID 131. The RMCC was Union Pacific's 24-hour emergency and non-emergency call dispatch center, where dispatchers functioned in a manner similar to 911 operators. *Id.* ¶¶ 10–11, Page ID 131–32.

Dispatchers coordinated emergency responses for critical railroad incidents, responded to related phone calls, notified government agencies about such incidents, and prepared written reports. *Id.* ¶ 11, Page ID 132.

At the beginning of each shift, dispatchers were briefed for about fifteen minutes about incidents that occurred during the prior shift. *Id.* ¶ 16, Page ID 133. They then relieved the previous shift's dispatchers. *Id.* Dispatchers were to be present at all times during their shift to take incoming calls and could not leave their desks after their shifts until relieved by the next dispatcher. *Id.* ¶ 18. Generally, only one on-duty dispatcher was allowed out of the RMCC at a time. *Id.*

Dispatchers were scheduled for 8.25 hour shifts and were subject to mandatory overtime based on staffing needs. *Id.* ¶ 19. They generally were required to manage inbound calls from start to end, which could require them to remain past the end of a shift. *Id.* ¶ 21. They all had five consecutive workdays per week followed by two consecutive rest days. *Id.* ¶ 15. Each day of a dispatcher's work week was color-coded to determine the order of overtime assignments. On a "red day," a dispatcher could be

Union Pacific's statement of material facts by broadly citing to her own statement, without pinpoint citations to the evidentiary record.
    [3] The Critical Call Dispatcher position was titled "RMCC Specialist II" until 2013. Supp. Brief ¶ 9, ECF No. 46, Page ID 131. The change in title did not affect the position's duties. *Id.*

called to begin a shift up to four hours before the standard start time and/or to remain at work up to four hours beyond the typical end time. *Id.* ¶ 21, Page ID 133. The parties dispute whether dispatchers were generally scheduled to work one or two "red days" per week. *Id.* On a "blue day," a dispatcher would be called to work the extended shift only if the "red day" dispatcher was unavailable. *Id.* ¶ 25, Page ID 134.

McNeil was assigned to the daytime shift, which generally began at 6:15 a.m. and ended at 2:30 p.m. *Id.* ¶ 20. Page ID 133. Good attendance and the ability to work overtime were important for the daytime shift, which tended to be the most demanding, with the greatest number of emergency calls, and typically required the most overtime. *Id.* ¶ 13, Page ID 132. On a "red day," McNeil could be called to work as early as 2:00 a.m. and stay as late as 6:00 p.m. *Id.* ¶¶ 23–24, Page ID 134.

## II. MCNEIL'S PREGNANCY AND RETURN TO WORK

From December 26, 2012 to January 13, 2013, McNeil took short-term disability leave due to complications related to pregnancy. *Id.* ¶ 26, Page ID 134. She then took maternity leave under the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601 *et seq.*, and returned to work on June 17, 2013. *Id.*

When McNeil returned to work she asked RMCC Director Brian Jarrett for training before she was placed back on the switchboard, but Jarrett denied her request. Opp. Brief ¶ 44, ECF No. 52, Page ID 466. Shortly after returning to work, McNeil made an unspecified error, which she attributed to Jarrett's refusal to retrain her, and the error resulted in disciplinary action. *Id.* McNeil claims that her white coworker Brittne Queck received training upon returning from maternity leave. *Id.* ¶ 45. Union Pacific and

Queck deny that such training occurred. Rep. Brief ¶ 187, ECF No. 59, Page ID 1868; Queck Decl. ¶ 5, ECF No. 58-2, Page ID 1814.

On or about September 18, 2013, RMCC Team Leader Kyla Jo Asher and Senior Manager Damien Thompson met with McNeil. Supp. Brief ¶ 27, ECF No. 46, Page ID 134. Union Pacific says this meeting was to "discuss concerns regarding her customer service and professionalism," *id.*, while McNeil says the meeting was to discuss the error that occurred as a result of Union Pacific's refusal to provide training, Opp. Brief ¶ 206, ECF No. 52, Page ID 500. In that meeting, the length of McNeil's breaks to pump breastmilk was discussed. Supp. Brief ¶ 27, ECF No. 46, Page ID 134. McNeil contends Asher and Thomson said she took breaks that were too long, although she pumped only during her lunch breaks. Opp. Brief ¶ 50, ECF No. 52, Page ID 468. McNeil claims the stress from this meeting affected her lactation, forcing her to supplement her child's diet with formula. *Id.* ¶ 52. She also alleges Queck was allowed to pump breastmilk at leisure, without complaint from Union Pacific. *Id.* ¶ 53, Page ID 468. Another RMCC dispatcher, Penni Anderson, stated that she "observed that Jarrett allowed [Queck] to breast pump at her leisure without any complaints." Anderson Decl. ¶ 16, ECF No. 52-2, Page ID 574. Union Pacific denies this, Rep. Brief ¶ 59, ECF No. 59, Page ID 1833, and Queck herself stated she never nursed her child, and so she never pumped breastmilk at work. Queck Dep. ¶ 6, ECF No. 59-2, Page ID 1903.

McNeil applied for a FMLA specialist position at Union Pacific in September 2013, but alleges Jarrett would not allow her to leave her shift to be interviewed. Supp. Brief ¶ 33, ECF No. 46, Page ID 135. She was not offered the position. *Id.*

## III. MCNEIL'S DISABILITY LEAVE

Union Pacific granted McNeil FMLA leave to care for her ailing mother, from January 17, 2014, to April 11, 2014.  *Id.* ¶ 38, Page ID 136.  While on leave, McNeil was diagnosed with depression and anxiety related to caring for her mother.  *Id.* ¶ 40.  On February 11, 2014, while on FMLA leave, McNeil applied for and received short-term disability benefits.  *Id.* ¶ 41.

On March 5, 2014, Union Pacific sent McNeil a letter, advising her that before she returned to work she must provide Union Pacific with medical records from her healthcare providers, demonstrating her ability to work.  *Id.* ¶ 42.  The letter also said the requested medical documentation was "separate and in addition to any information already provided to MetLife to approve disability benefits."  *Id.* (quoting ECF No. 46-8, Page ID 207).

In May 2014, McNeil and her physicians determined that she should be able to return to work on June 6, 2014, on a temporarily-reduced schedule of eight-hour shifts, four days per week, through August 1, 2014.  *Id.* ¶ 43, Page ID 137.  On May 30, 2014, MetLife informed Union Pacific that McNeil could return to work four days a week, with an 8.5-hour shift.  *Id.* ¶ 44, Page ID 137.  On June 2, 2014, Jarrett stated in an intra-office email that he could accommodate McNeil's medical restrictions by removing her from emergency calls 90 minutes before the end of her shift.  ECF No. 46-18, Page ID 245.

Union Pacific alleges that it could accommodate this restriction only because it was less than eight weeks in duration, which Union Pacific considered temporary.  Opp. Brief ¶ 44, ECF No. 46, Page ID 137.  McNeil disputes that Union Pacific had any policy

classifying medical restrictions of less than eight weeks as temporary, and restrictions exceeding eight weeks as permanent. *See* Opp. Brief ¶ 208, ECF No. 52, Page ID 500–01.

McNeil did not return to work on June 6. She transitioned to long-term disability leave (LTD) on June 17, 2014. *Id.* ¶ 45. Once McNeil took LTD, Union Pacific sought to backfill her position, consistent with its policy.[4] Supp. Brief ¶ 47 ECF No. 46, Page ID 137; ECF No. 52-47, Page ID 1031 ("Once an employee goes on LTD . . . Union Pacific will generally seek to fill the position.").

On or about July 28, 2014, Jarrett informed a group of critical call dispatchers that McNeil was "no longer with Union Pacific" and it was looking for candidates to fill her position. *Id.* ¶ 48; Opp. Brief ¶ 74, ECF No. 52, Page ID 472. Dispatcher Juanita Love called McNeil and told her Jarrett announced that she was no longer with the company. Supp. Brief ¶ 48 ECF No. 46, Page ID 137. Shortly after, McNeil spoke with Jarrett over the phone and recorded the conversation. Jarrett said he meant that he did not expect McNeil back "anytime soon." ECF No. 52-9, Page ID 777.

On August 27, 2014, Union Pacific Employee Benefits Director Dawn Weindel called McNeil because Weindel was told by MetLife that McNeil planned to return to work soon. *Id.* ¶ 50. Weindel informed McNeil that anyone who had been on LTD for a long period had to go through a fitness-for-duty (FFD) exam with the health and medical group. *Id.* She also told McNeil that when an employee went on LTD, the department could fill that employee's job. Weindel provided McNeil with contact information for FFD

---

[4] McNeil nominally denied this paragraph of Union Pacific's statement of material fact, *see* Opp. Brief ¶ 208, ECF No. 52, Page ID 500–01, however, the denial does not specifically address the fact or provide a pinpoint citation to the record for support. Under NECivR 56.1(b)(1), the fact is therefore admitted.

Nurse Jennifer Roberts and told McNeil to call HR Manager Liz Winkler[5] to let her know McNeil would be released to work in the next couple of weeks. *Id.*

After her conversation with Weindel, McNeil called Winkler to inform her that McNeil expected to be released to return to work within a few weeks. *Id.* ¶ 51. McNeil recorded the conversation. McNeil said she wanted to make sure her "job was there." McNeil Dep. 172:5, ECF No. 46-20, Page ID 321. Winkler told McNeil "[y]ou know how much turnover there is in RMCC, so there is pretty much, you know, a job," *id.* at 172:7–9, and that when an employee returned from LTD "if your position is available when you come back, you can come back to that one, or if it wasn't . . . the company, we'd find you a place," *id.* at 179:6–9, Page ID 322. Winkler also stated, "we do have vacancies in the RMCC right now," *id.* at 173:9–10, but Union Pacific couldn't promise McNeil would be able to return to the daytime shift, *id.* at 173:14–23. Winkler told McNeil she would need to pass an FFD exam before returning to work. Supp. Brief ¶ 51, ECF No. 46, Page ID 138. On that call, McNeil did not inform Winkler that McNeil's doctors imposed any work restrictions, or that she would not be able to work overtime. *Id.* ¶ 52; McNeil Dep. 176:2–5, ECF No. 46-20, Page ID 322.

On September 22, 2014, McNeil's medical provider, CHI Health Benson Clinic, sent Union Pacific a 17-page fax that included a letter from Dr. Sanjeev Sharma, dated August 29, 2014, which stated "[i]t is my professional medical opinion that Tasha McNeil may return to work on 9/2/14. Please allow her only morning shifts and no overtime." Supp. Brief ¶ 55, ECF No. 46, Page ID 139 (quoting ECF No. 53-7).

On September 26, 2014, Roberts emailed McNeil to inform her that the medical

---

[5] Subsequent to events relevant to the motion for summary judgment, Winkler married and changed her name to Tipton. Thus her name appears as Liz Tipton at various places in the record.

department was confused as to whether she was released with or without restrictions. *Id.* ¶ 57. McNeil told Roberts she could only work daytime hours and no overtime until approximately January, and her restrictions were included in the medical packet sent to Union Pacific. *Id.* Union Pacific contends it did not receive any further medical documents regarding McNeil's restrictions from Benson Clinic or her other care providers between September 22, 2014, and McNeil's termination on October 28, 2015. *Id.* ¶ 60, Page ID 140. McNeil contends that she spoke with Benson Clinic employee Tanika Broadway, who stated she "may very well have faxed McNeil's medical records to Union Pacific on [August 13, 2015]." Opp. Brief ¶ 129, ECF No. 52, Page ID 484.

Union Pacific says it did not accommodate McNeil's proposed restrictions because it "could not accommodate permanent overtime restrictions" and the RMCC did not have any daytime shift positions available at that time. Supp. Brief ¶ 61, ECF No. 46, Page ID 140. McNeil alleges there were many open positions in the RMCC for which she was qualified at the time Union Pacific was notified that she was ready to return to work. Opp. Brief ¶¶ 136–43, ECF No. 52, Page ID 485–86. Although the RMCC work schedule appeared to show three vacancies in September 2014, Union Pacific states that employees were hired up to two months in advance for those positions to ensure adequate training time, and effectively there were no open positions for which McNeil was qualified. Supp. Brief ¶ 63, ECF No. 46, Page ID 140.

On October 13, 2014, Union Pacific informed McNeil it could not accommodate her work restrictions and there were no open positions in the RMCC. *Id.* ¶ 64, Page ID 140–41. A short time later, Winkler left McNeil a voicemail notifying her that there were no openings in the RMCC and that she could apply for other Union Pacific positions

when she was able to return to work.  *Id.* ¶ 65, Page ID 141.

On October 20, 2014, McNeil received a letter from Terry Owens of Union Pacific's return-to-work program, stating that McNeil's "supervising department ha[d] been unable to identify a reasonable accommodation that will permit you to safely return to work in your assigned position."  *Id.* ¶ 66 (quoting ECF No. 52-37, Page ID 996).  The letter referred her to Union Pacific's Disability Management Department for assistance and included a number to call for assistance in finding a job at Union Pacific.  *Id.*

On June 24, 2015, McNeil received a letter from Employee Benefits Director Kari Peacock indicating that McNeil's LTD benefits would end on June 26, 2015.  *Id.* ¶ 70, Page ID 142.  The letter stated, "[i]f you are seeking to return to work with Union Pacific due to the exhaustion of LTD benefits, please notify me immediately" and, "[i]n order to return to work with Union Pacific, you must have a release to return to work from your treating provider and must submit information . . . for a fitness for duty review."  *Id.* (quoting ECF No. 52-38, Page ID 1000).

In a subsequent conversation, Peacock informed McNeil that a list of open positions at the RMCC would not be available until McNeil received clearance to return to work from her doctor.  *Id.* ¶ 71.  At Peacock's direction, McNeil called FFD Nurse Pam Pachaud on July 8, 2015.  *Id.* ¶ 72.  Pachaud returned her call on July 29, 2015, and told McNeil that she would not be able to return to work until she was released from her restrictions.  *Id.*  The parties dispute whether the Benson Clinic faxed new medical records after July 29, 2015.

On October 28, 2015, Jarrett sent a letter to McNeil explaining that Union Pacific terminated her employment due to the expiration of her LTD and her failure to use

Union Pacific's return-to-work program.  *Id.* ¶ 75, Page ID 143.  Union Pacific alleges that after July 29, 2015, McNeil did not contact anyone at Union Pacific until after the letter of termination was issued.  *Id.* ¶ 74, Page ID 142.

## IV. MCNEIL'S EEOC CHARGE AND APPLICATIONS FOR OTHER POSITIONS

McNeil filed a Charge of Discrimination with the Nebraska Equal Opportunity Commission (NEOC) on March 11, 2015.  *Id.* ¶ 77.  She amended her charges in January of 2016, and filed them with the United States Equal Opportunity Employment Opportunity Commission (EEOC).  On May 7, 2015, she applied for a Labor Relations Officer position with Union Pacific.  *Id.* ¶ 78.  The Labor Relations Officer was responsible for ensuring compliance with collective bargaining agreements and auditing timekeeping processes. *Id.* ¶ 79.

Union Pacific alleges that General Director Alan Weed, who made the hiring decision for the Labor Relations Officer position, had no knowledge of McNeil's medical leave, disability, or Charge of Discrimination when he determined which candidates to interview and hire.  *Id.* ¶ 82, Page ID 143–44.  Union Pacific alleges that Weed chose not to interview or hire McNeil because she was not qualified for the position.  *Id.* ¶ 84, Page ID 144.

On June 7, 2015, McNeil applied for a Manager of Background Investigations position at Union Pacific.  *Id.* ¶ 84.  Union Pacific ultimately did not hire anyone to fill the position.  *Id.* ¶ 85.  It alleges that Chad Deasy, the employee who made the decision not to fill the position, did not know McNeil filed a Charge of Discrimination, and McNeil has not presented any evidence to the contrary.  *Id.* ¶ 85.

## V. PROFFERED COMPARATORS

In January 2012, dispatcher Darcey Brinson requested a medical accommodation allowing her to work daytime shifts, including overtime and early call-in shifts on an occasional basis. *Id.* ¶ 91, Page ID 145. Union Pacific accommodated this restriction by moving Brinson to an open day-shift position. In or about March 2011, dispatcher Dennis McCabe requested a medical accommodation limiting his shifts to ten hours. *Id.* ¶ 91, Page ID 145. That restriction allowed him to work his standard 8.25-hour shift with flexibility to work overtime and handle emergency calls as needed, and Union Pacific accommodated the request. *Id.*

McNeil also identified Justin Larsen[6] as a dispatcher whom Union Pacific accommodated, allowing him to work with certain medical restrictions. *Id.* ¶ 93. In 2012, Larsen could work twelve-hour shifts only on an occasional basis. Such restriction allowed him to work his standard 8.25-hour shift with flexibility to work overtime and handle emergency calls as needed, and Union Pacific accommodated the restriction. *Id.* ¶ 94, Page ID 145–46.

## VI: FILING OF CLAIM

McNeil filed this action in the District Court for Douglas County, Nebraska, on June 30, 2016, asserting claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, and the Nebraska Fair Employment Practice Act (NFEPA), Neb. Rev. Stat. §§ 48-1101 to 48-1125. *See* ECF No. 1-1. Defendants removed to this Court on September 23,

---

[6] In her Amended Complaint, McNeil also identified a coworker named Rick, whose last name was unknown to McNeil, as an accommodated disabled dispatcher. Union Pacific alleges that it has no record of a dispatcher named "Rick" with work restrictions, Supp. Brief ¶ 95, ECF No. 46, Page ID 146, and McNeil has produced no further evidence of this comparator.

2016. *See* ECF No. 1. In her Complaint, McNeil pled claims for sex and pregnancy discrimination under Title VII and NFEPA (Claim I); race discrimination under Title VII and NFEPA (Claim II); disability discrimination under NFEPA (Claim III); retaliation for her NEOC and EEOC claims under NFEPA (Claim IV); retaliation for taking FMLA leave (Claim V); discrimination under ADA (Claim VI); retaliation for requesting a reasonable accommodation under ADA and NFEPA (Claim VII); and "wrongful discharge in violation of public policy" (Claim VIII).

## STANDARD OF REVIEW

"Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Garrison v. ConAgra Foods Packaged Foods, LLC*, 833 F.3d 881, 884 (8th Cir. 2016) (citing Fed. R. Civ. P. 56(c)). "Summary judgment is not disfavored and is designed for every action." *Briscoe v. Cty. of St. Louis*, 690 F.3d 1004, 1011 n.2 (8th Cir. 2012) (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc)). In reviewing a motion for summary judgment, the Court will view "the record in the light most favorable to the nonmoving party . . . drawing all reasonable inferences in that party's favor." *Whitney v. Guys, Inc.*, 826 F.3d 1074, 1076 (8th Cir. 2016) (citing *Hitt v. Harsco Corp.*, 356 F.3d 920, 923–24 (8th Cir. 2004)). Where the nonmoving party will bear the burden of proof at trial on a dispositive issue, "Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Se. Mo. Hosp. v. C.R. Bard, Inc.*, 642 F.3d 608, 618 (8th Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). The moving

party need not produce evidence showing "the absence of a genuine issue of material fact." *Johnson v. Wheeling Mach. Prods.*, 779 F.3d 514, 517 (8th Cir. 2015) (quoting *Celotex*, 477 U.S. at 325). Instead, "the burden on the moving party may be discharged by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case." *St. Jude Med., Inc. v. Lifecare Int'l, Inc.*, 250 F.3d 587, 596 (8th Cir. 2001) (quoting *Celotex*, 477 U.S. at 325).

In response to the moving party's showing, the nonmoving party's burden is to produce "specific facts sufficient to raise a genuine issue for trial." *Haggenmiller v. ABM Parking Servs., Inc.*, 837 F.3d 879, 884 (8th Cir. 2016) (quoting *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 853 (8th Cir. 2012)). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial." *Wagner v. Gallup, Inc.*, 788 F.3d 877, 882 (8th Cir. 2015) (quoting *Torgerson*, 643 F.3d at 1042). "[T]here must be more than the mere existence of some alleged factual dispute" between the parties in order to overcome summary judgment. *Dick v. Dickinson State Univ.*, 826 F.3d 1054, 1061 (8th Cir. 2016) (quoting *Vacca v. Viacom Broad. of Mo., Inc.*, 875 F.2d 1337, 1339 (8th Cir. 1989)).

In other words, in deciding "a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts." *Wagner*, 788 F.3d at 882 (quoting *Torgerson*, 643 F.3d at 1042). Otherwise, where the Court finds that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," there is no "genuine issue of

material fact" for trial and summary judgment is appropriate. *Whitney*, 826 F.3d at 1076

(quoting *Grage v. N. States Power Co.-Minn.*, 813 F.3d 1051, 1052 (8th Cir. 2015)).

## DISCUSSION

### I. Sex and Pregnancy Discrimination—Claim I

Union Pacific argues Claim I is untimely. In Nebraska, a plaintiff "must file a

charge with the EEOC within 300 days after the alleged unlawful employment practice

occurred to preserve the Title VII action." *Owens v. Ramsey Corp.*, 656 F.2d 340, 342

(8th Cir. 1981) (citing 42 U.S.C. s 2000e-5(e)). McNeil argues that the facts underlying

Claim I form the start of an ongoing violation that continued until her termination. Even

if the statute of limitations had not run on McNeil's sex and pregnancy discrimination

claims, the Court concludes that she has failed to present a *prima facie* case of

discrimination.

Because McNeil lacks direct evidence of sex or pregnancy discrimination, she

must establish a *prima facie* case under the *McDonnell-Douglas* framework. *See*

*Young v. Builders Steel Co.*, 754 F.3d 573, 577 (8th Cir. 2014) (citing *McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792 (1973)). To do so, McNeil must first show that

"(1) [she] is a member of a protected class, (2) [she] met [Union Pacific's] legitimate

expectations, (3) [she] suffered an adverse employment action, and (4) the

circumstances give rise to an inference of discrimination (for example, similarly situated

employees outside the protected class were treated differently)." *Id.* (quoting *Gibson v.*

*Am. Greetings Corp.*, 670 F.3d 844, 853 (8th Cir. 2012)). Union Pacific's refusal to

retrain McNeil, and the single meeting in which she was told her breaks were too long,

are not sufficient to demonstrate an adverse action, nor do they give rise to an inference

of discrimination on the basis of sex or pregnancy.  *See Lixin Liu v. BASF Corp.*, 409 F. App'x 988, 991 (8th Cir. 2011) (citing *Bass v. SBC Communications, Inc.*, 418 F.3d 870, 872–73 (8th Cir. 2005)) ("In responding to a summary judgment motion, an unsupported self-serving allegation is ineffective.").  No reasonable jury could conclude that Union Pacific discriminated against McNeil on the basis of her sex or her pregnancy, and the Court will grant summary judgment as to Claim I.

## II.  Race Discrimination— Claim II

McNeil alleges that her race was a motivating factor in Union Pacific's denial of an accommodation for her disability, *i.e.*, the inability to work overtime, and that Union Pacific accommodated similarly-situated white coworkers.  As with Claim I, to make a *prima facie* showing of race-based discrimination, McNeil must show that similarly situated employees who were not members of the protected class were treated differently.  *See Philip v. Ford Motor Co.*, 413 F.3d 766, 768 (8th Cir. 2005) (citing *Gilmore v. AT&T*, 319 F.3d 1042, 1046 (8th Cir. 2003)).  This requires McNeil to produce "'specific, tangible evidence' that employees who were 'similarly situated in all respects' to [her] received different treatment from [Union Pacific]."  *Philip*, 413 F.3d at 768 (8th Cir. 2005) (first quoting *Rose–Maston v. NME Hosp., Inc.*, 133 F.3d 1104, 1109 n.4 (8th Cir. 1998), then *Gilmore*, 319 F.3d at 1046).  "The test to determine whether individuals are similarly situated 'is rigorous and requires that the other employees be similarly situated in all relevant respects before the plaintiff can introduce evidence comparing herself to the other employees.'"  *Chism v. Curtner*, 619 F.3d 979, 984 (8th Cir. 2010) (quoting *Fields v. Shelter Mut. Ins. Co.*, 520 F.3d 859, 864 (8th Cir. 2008)),

*abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011).

There is no dispute that Brinson, McCabe, and Larsen were white Union Pacific employees who received accommodations for disabilities. Yet, drawing all reasonable inferences in McNeil's favor, she has not established that the comparators were sufficiently similar to her, and she cannot establish a *prima facie* case.

McNeil alleges that Brinson suffered from depression and anxiety, like McNeil, and worked the same position as a dispatcher on the day shift at the RMCC. Although McNeil alleges that Brinson "could only work her regular 8.25 hour shift and no overtime," Opp. Brief ¶ 171, ECF No. 52, Page ID 491, the documents McNeil cites for support show that Brinson could work the day shift with "[o]ccasional (up to 33% of the time) early call in or overtime," *see* ECF No. 53-13, Page ID 1376. The evidence also shows that Brinson was scheduled to work three "red days" in December 2014, and worked overtime on multiple occasions in 2014[7] and 2015.[8]

McNeil alleges Union Pacific accommodated Justin Larsen, a white male dispatcher in the RMCC, who suffered a workers compensation injury. There is no dispute Union Pacific accommodated Larsen's restriction of working only occasional overtime. The evidence cited by both parties indicates that "occasional" meant "11–33% of the time." ECF No. 58-15, Page ID 1517.

McNeil also alleges Union Pacific accommodated Dennis McCabe, a white male dispatcher in the RMCC, who suffered from a low back disability. Opp. Brief ¶¶ 176–78,

---

[7] Specifically, in 2014, Brinson worked an extra four hours on February 8; came in 4 hours early on April 6; came in 4 hours early and worked 12.25 hours on April 13; worked 12 hours on October 12; came in 5.5 hours early and worked 12.75 hours on November 2; and worked 12 hours on December 21. Rep. Brief ¶ 174, ECF No. 59, Page ID 1866 (citing ECF No. 52-48).

[8] In 2015, Brinson came in 4 hours early on March 2; worked 12.25 hours on April 13 and 25; and came in 4 hours early on April 19 and 21. *Id.* ¶ 175 (citing ECF No. 52-11).

ECF No. 52, Page ID 491–92. McNeil alleges "McCabe's accommodation was similar to McNeil in that he could only work his regular 8.25 hour shift and limited overtime of the maximum of 10 hours." *Id.* ¶ 177, Page ID 492. There is no dispute that Union Pacific provided McCabe an accommodation; that he was limited to working ten-hour shifts; and that his restriction was permanent. However, Union Pacific disputes that McCabe's restriction was similar to McNeil's. Notably, Union Pacific cites evidence showing that between 2013 and 2015, McCabe worked beyond his 8.25 hour shift on multiple occasions.[9] The evidence also shows that McCabe was able to work overnight shifts and was not limited to the day shift, as McNeil would have been. *See, e.g.*, ECF No. 52-48, Page ID 1033.

McNeil does not dispute that the schedule logs indicate McCabe worked overtime on multiple occasions, but she alleges that they "do[] not accurately reflect [McCabe's] restriction," and that "it was common knowledge that McCabe never actually worked any overtime despite the RMCC schedule." Opp. Brief ¶ 177, ECF No. 52, Page ID 492 (citing Anderson Decl. ¶¶ 11–12, ECF No. 52-2, Page ID 573). For support, McNeil cites Anderson's declaration, ECF No, 52-2. In her declaration, Anderson stated that "McCabe had an overtime restriction and was never required to work over 8.25 hour shifts" and that "[a]lthough the RMCC schedules indicate that McCabe was scheduled [to work overtime], McCabe never actually worked those mandatory overtime hours." *Id.* ¶ 11, Page ID 573.

---

[9] Specifically, the evidence shows that in 2013, McCabe worked overtime on March 5, May 7, June 24, September 13, and October 24. Rep. Brief ¶ 177, ECF No. 59, Page ID 1866–67 (citing ECF No. 52-18). McCabe also worked overtime on March 7, 2014, and June 23, 2015. *Id.* (citing ECF No. 52-48; 52-11).

Although Anderson stated she knew McCabe personally, nothing in her declaration indicates how this information could be within Anderson's personal knowledge. To the contrary, the RMCC schedules reveal that Anderson and McCabe frequently worked different shifts, so Anderson would not have observed when McCabe was working overtime. *See* ECF No. 52-48. To be considered on a motion for summary judgment, Anderson's declaration needed to show that the facts to which she testified were within her personal knowledge and that she was "competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). The declaration does not do so, and the Court will not rely upon it.[10]

The evidence presented establishes that McNeil's proffered comparators were all able to, and did in fact, work overtime. Conversely, McNeil was limited to the day shift and could not work any overtime for four months upon her return to work. There is no dispute that Union Pacific considered the dispatcher position a safety-sensitive one, and that Union Pacific employed measures to ensure it had adequate staff in the RMCC at all times. These included requiring Critical Care Dispatchers to be available to work substantial overtime, in the form of both scheduled availability and flexibility to stay past shift to complete calls.

The ability of McCabe, Larsen, and Brinson to work occasional overtime and, in the cases of Larsen and McCabe, other shifts beside the daytime shift, disqualifies them as potential comparators to McNeil. The Court will grant summary judgment as to Claim II.

---

[10] For this same reason, the Court will grant Union Pacific's motion to strike, ECF No. 57, as it pertains to ¶ 11 of Anderson's declaration.

### III. Disability Discrimination—Claims III & VI

In Claims III and VI, McNeil alleges that Union Pacific discriminated against her by failing to accommodate her inability to work overtime upon her return from LTD.[11]

To support a failure-to-accommodate claim, a plaintiff "must establish both a prima facie case of discrimination based on her disability and a failure to accommodate it." *Kelleher v. Wal-Mart Stores, Inc.*, 817 F.3d 624, 631 (8th Cir. 2016) (quoting *Schaffhauser v. United Parcel Serv.*, Inc., 794 F.3d 899, 905 (8th Cir. 2015)). Establishing a prima facie case of disability discrimination requires a plaintiff to show "(1) a qualifying disability; (2) qualifications to perform the essential functions of her position with or without reasonable accommodation; and (3) an adverse employment action due to her disability." *Id.* (citing *Norman v. Union Pac. R.R. Co.*, 606 F.3d 455, 459 (8th Cir. 2010)).

Union Pacific argues that McNeil was not qualified to perform an essential function of the job, *i.e.*, the ability to work overtime. "The term essential functions means the fundamental job duties of the employment position" and "does not include the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1). Evidence that a job function is essential may include "[t]he employer's judgment as to which functions are essential;" "[w]ritten job descriptions prepared before advertising or interviewing applicants for the job;" "[t]he amount of time spent on the job performing the function;" and "[t]he consequences of not requiring the incumbent to perform the function." 29 C.F.R. § 1630.2(n)(3).

---

[11]    Regarding Claim III, McNeil's Complaint only cites to NFEPA, but Union Pacific interprets McNeil's Rule 26(f) Report to indicate the claim is also intended to invoke the ADA. *See* Opp. Brief n.5, ECF No. 52, Page ID 150. The analysis for both ADA and NFEPA in this regard is the same. *See Orr v. Wal-Mart Stores, Inc.*, 297 F.3d 720, 723 (8th Cir. 2002) (citing *Father Flanagan's Boys' Home v. Agnew*, 590 N.W.2d 688, 693 (Neb. 1999); *IBP, Inc. v. Sands*, 563 N.W.2d 353, 357–59 (Neb. 1997)).

"An employer's mandatory overtime requirement has been recognized as an essential job function," *Tjernagel v. Gates Corp.*, 533 F.3d 666, 673 (8th Cir. 2008) (citing *Davis v. Florida Power & Light Co.*, 205 F.3d 1301, 1305–06 (11th Cir. 2000)), and "overtime work . . . is akin to job presence, which has been held to be an essential function of a job." *Id.* (alteration in original) (quoting *Davis*, 205 F.3d at 1305–06). Furthermore, "[a]n employee who cannot meet the attendance requirements . . . cannot be considered a 'qualified' individual protected by the ADA." *Id.* (alteration in original) (quoting *Davis*, 205 F.3d at 1306).

In *Tjernagel*, the Court of Appeals concluded that mandatory overtime was an essential function of a manufacturing position where the job description stated "[o]vertime is required to meet production demands and can include Saturdays and Sundays when necessary," and the record showed that company employees worked twenty-two Saturdays during the relevant calendar year. *Id.* Regarding the plaintiff in *Tjernagel*, who had a permanent restriction preventing overtime work, the court noted that all other production positions required overtime as well, and thus the plaintiff could not have been moved to one of them. *Id.* (citing *Epps v. City of Pine Lawn*, 353 F.3d 588, 593 n.5 (8th Cir. 2003)). Thus, the plaintiff was not able to perform an essential function of the job and did not qualify for ADA protection. *Id.*

Applying the criteria of the CFR and the reasoning in *Tjernagel* to the evidence in this case, it is clear that the ability to work overtime was an essential function of the Critical Care Dispatcher position. The dispatchers' work schedules included multiple layers of redundancy to ensure staff availability for overtime work. The RMCC's Scheduling and Attendance Guidelines stated that dispatchers "are scheduled for a 8.25

hour shift, but are subject to mandated overtime based on the staffing needs of a shift," and dispatchers "can be called to begin their shift up to four hours prior to their standard start time and/or remain working an additional four hours beyond their typical shift end time." ECF No. 46-4, Page ID 180. Although the exact number of dispatcher "red days" may be in dispute, there appears to be no argument that dispatchers were expected to work "red days," at least three to four times per month, necessitating availability to work overtime. If a dispatcher were not available to work overtime, other dispatchers would be required to work overtime more frequently. *See Rehrs v. Iams Co.*, 486 F.3d 353, 357 (8th Cir. 2007) (citing *Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090, 1094 (5th Cir. 1996) ("Under the ADA, an accommodation that would cause other employees to work harder, longer, or be deprived of opportunities is not mandated."). If other dispatchers were *not* required to work extra overtime to compensate for one employee's inability to work overtime, the safety of Union Pacific operations would be impaired.

McNeil also argues that she should have been accommodated because her restriction was temporary. The parties dispute whether Union Pacific was aware that McNeil's restrictions were temporary. Union Pacific alleges that the only medical records it received directly from McNeil's care providers contained no end date for the restrictions, while McNeil contends Union Pacific received notification of the temporary nature of the restriction from Metlife. Union Pacific asserts that it considers any restriction lasting more the four months to be permanent, and McNeil asserts that Union Pacific lacks a written policy to support that position. Regardless, the Court concludes that neither the ADA nor NFEPA required Union Pacific to accommodate McNeil's inability to perform an essential function of her job for *any* length of time.

McNeil argues that Union Pacific's willingness to accommodate her restriction in September 2014 shows the reasonableness of the accommodation and, *ergo*, the non-essential nature of her ability to work overtime. Yet, "[a]n employer does not concede that a job function is 'non-essential' simply by voluntarily assuming the limited burden associated with a temporary accommodation, nor thereby acknowledge that the burden associated with a permanent accommodation would not be unduly onerous." *Rehrs*, 486 F.3d at 358 (alteration in original) (quoting *Laurin v. Providence Hosp.*, 150 F.3d 52, 59 n.6 (1st Cir. 1998))). Union Pacific's willingness to accommodate McNeil's medical restriction for a period of a few weeks is insufficient to overcome the weight of evidence showing that the ability to work overtime was an essential function of McNeil's position.

For these reasons, McNeil cannot meet her *prima facie* case for failure to accommodate under the ADA or NFEPA,[12] and the Court will grant summary judgment as to Claims III and VI.

In Claim VII, McNeil alleges that Union Pacific terminated her in retaliation for requesting a reasonable accommodation. Because the ability to work overtime was an essential function of the position, her requested accommodation was not reasonable. Therefore, summary judgment will be granted on Claim VII as well.

## IV. EEOC Retaliation—Claims IV and VIII

In Claim IV, McNeil alleges that Union Pacific retaliated against her because she filed NEOC and EEOC discrimination complaints. In Claim VIII, she alleges Union Pacific wrongfully terminated her in violation of Nebraska public policy.

---

[12] Because she has not met her *prima facie* case, the Court need not examine the factual disputes and arguments surrounding whether Union Pacific engaged in the interactive process to determine if McNeil could be accommodated. *See Battle v. United Parcel Serv., Inc.*, 438 F.3d 856, 864 (8th Cir. 2006) (citing *Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944, 952 (8th Cir. 1999)) ("Under the ADA, if no reasonable accommodation is available, an employer is not liable for failing to engage in a good-faith interactive process.").

"Title VII[13] prohibits retaliation against employees who initiate or participate in a proceeding or investigation that claims their employer violated Title VII." *Recio v. Creighton Univ.*, 521 F.3d 934, 938 (8th Cir. 2008) (citing 42 U.S.C. § 2000e–3(a)); *Ogden v. Wax Works, Inc.*, 214 F.3d 999, 1007 (8th Cir. 2000) ("Employers may not retaliate against employees who 'oppose discriminatory conduct.'") (quoting 42 U.S.C. § 2000e–3(a)).  To state a *prima facie* case for retaliation, McNeil must demonstrate that: (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action, and (3) a causal connection exists between the protected activity and the adverse employment action.  *Brannum v. Mo. Dep't of Corr.*, 518 F.3d 542, 547 (8th Cir. 2008).  If McNeil meets this initial burden, a presumption of retaliation arises, and the burden shifts to Union Pacific to rebut it "by offering a legitimate, nonretaliatory reason for any adverse employment action that [McNeil] suffered." *Id.* (citing *Buettner v. Arch Coal Sales Co.*, 216 F.3d 707, 714 (8th Cir. 2000)).  If Union Pacific does so, McNeil has the burden to show "the proffered reason is merely a pretext for retaliation and, ultimately, that [Union Pacific] was actually motivated by retaliatory animus." *Id.* (citing *Buettner*, 216 F.3d at 714).

"An adverse employment action is a tangible change in working conditions that produces a material employment disadvantage . . . ." *Wilkie v. Dep't of Health & Human Servs.*, 638 F.3d 944, 955 (8th Cir. 2011) (quoting *Clegg v. Ark. Dep't of Corr.*, 496 F.3d 922, 926 (8th Cir. 2007)).  "Minor changes in duties or working conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage, do

---

[13] As in Claim III, McNeil only alleged a violation of the NFEPA in Claim IV.  *See* ECF No. 101, Page ID 13.  The analysis is the same as under Title VII.  *See Orr*, 297 F.3d at 723.

not rise to the level of an adverse employment action." *Id.* (quoting *Clegg*, 496 F.3d at 926).

McNeil alleges Union Pacific subjected her to various retaliatory adverse employment actions. Specifically, McNeil identifies Union Pacific's failure to notify her of RMCC openings, its refusal to interview her for other internal positions, its "disregard of her attempts to make contact" to return to work, and its termination of her employment. Compl. ¶ 48, ECF No.1-1, Page ID 13. The Court concludes that McNeil has not stated a *prima facie* case of retaliation as to any of these actions.

McNeil's claim that Union Pacific failed to notify of her open positions cannot serve as the basis for retaliation because, as the Court has already determined, she was not able to perform an essential function of the dispatcher position. Regardless of any factual disputes surrounding the alleged availability of various RMCC shifts, McNeil was not qualified to perform the jobs, because she could not work overtime.

As to McNeil's two applications for other positions at Union Pacific—the Labor Relations Officer and Manager of Background Investigations—McNeil has not shown that the people who made those hiring decisions knew McNeil engaged in any protected activity. *See Culton v. Mo. Dep't of Corr.*, 515 F.3d 828, 831 (8th Cir. 2008) (citing *Smith v. Riceland Foods,* Inc., 151 F.3d 813, 818 (8th Cir. 1998)) (holding that failure by the plaintiff to present evidence that the decision-maker was aware of protected conducted was fatal to the plaintiff's retaliation claim). Both Weed and Deasy testified they were unaware of McNeil's leave status or charge of discrimination at the time they made their hiring decisions. Weed Decl. ¶ 3, ECF No. 46-26, Page ID 411; Deasy Decl.

¶ 5, ECF No. 46-27, Page ID 413. McNeil has not presented any evidence to the contrary.

As to McNeil's allegation that Union Pacific disregarded her attempts to communicate, she has not shown that Union Pacific's silence was an adverse employment action. She alleges Pachaud told her on July 8, 2015, that she could not return to work until Union Pacific received medical documentation demonstrating that she could return without restrictions. Opp. Brief. ¶ 125, ECF No. 52, Page ID 484. She further alleges that she instructed the Benson Clinic to send such documentation; that she was cleared to return to work without restrictions; and that she received no further communication from Union Pacific until her termination letter on October 28, 2015. *Id.* ¶ 131, Page ID 484. Union Pacific alleges it never received any medical records from Benson Clinic after McNeil's conversation with Pachaud. McNeil's only evidence that such records were sent is McNeil's declaration that Broadway said she "may very well have faxed" the records. Opp. Brief ¶ 129, ECF No. 52, Page ID 484 (citing McNeil Decl. ¶ 75, ECF No. 52-1, Page ID 566). A hearsay statement, indicating that an event "may" have occurred, is insufficient to create a triable issue. McNeil has not presented evidence that Union Pacific disregarded her communications, let alone that its silence was an adverse employment action.

McNeil alleges Union Pacific terminated her in retaliation for filing charges with the NEOC and EEOC, yet she has not presented evidence from which it can be inferred that Union Pacific's stated reason for termination—the expiration of her disability leave and lack of medical clearance to return without restriction—was pretextual. McNeil argues that pretext can be inferred from Union Pacific's shifting explanations for her

termination. She contends Union Pacific initially accommodated her March 2014 restrictions, then stated it could not accommodate her restrictions, then stated it could not accommodate the restrictions because of their duration, and finally terminated her employment based on medical records sent from Benson Clinic that contained no end date for the restrictions, though she contends Union Pacific was apprised through other sources that her restrictions would end in January. She also relies on Union Pacific's inability to identify who made the decision to terminate her, and the proximity in time between her EEOC charge and termination—seven months.

The evidence shows that Union Pacific at all times maintained that an essential function of the dispatcher position was the ability to work overtime. McNeil's argument as to the timing of her termination is unavailing, because her LTD expired after the filing of her EEOC charge and before her termination. A reasonable jury could not infer that Union Pacific's legitimate, non-discriminatory reason for McNeil's termination was a pretext for retaliation. *See Kipp v. Mo. Highway & Transp. Comm'n.*, 280 F.3d 893, 897 (8th Cir. 2002) ("[T]he interval of *two months* between the complaint and [the plaintiff's] termination so dilutes any inference of causation that we are constrained to hold as a matter of law that the temporal connection could not justify a finding in [the plaintiff's] favor on the matter of causal link." (emphasis added)); *see also Lors v. Dean*, 746 F.3d 857, 865–66 (8th Cir. 2014) ("Although we have refrained from 'draw[ing] a definitive line,' we have recognized that '[m]ore than two months is too long to support a finding of causation without something more.'" (alteration in original) (quoting *Sisk v. Picture People, Inc.*, 669 F.3d 896, 901 (8th Cir. 2012))).

McNeil's claim for wrongful discharge in violation of Nebraska public policy also fails, as the public policy exception to Nebraska's at-will employment is narrow, and the Nebraska Supreme Court has never recognized this exception on facts similar to McNeil's case.  *See Trosper v. Bag 'N Save*, 734 N.W.2d 704, 707 (Neb. 2007) (limiting the public policy exception to "cases when a clear mandate of public policy has been violated").  McNeil has not alleged any clear mandate, and the Court finds none.

For these reasons, the Court will grant summary judgment as to Claims IV and VIII.

## V. FMLA Retaliation—Claim V

In Claim V, McNeil alleges that "[i]n response to [McNeil's] use of federally protected leave, Defendant took adverse and retaliatory actions," which included "the release of [McNeil's] confidential medical information to other employees" and "falsely [notifying coworkers] that [McNeil] no longer worked for Union Pacific."  Compl. ¶¶ 55 & 56, ECF No. 1-1, Page ID 14.  Yet the only information McNeil alleges was disclosed was the inaccurate statement that she was no longer employed by Union Pacific.  *See* ECF No. 52-2; ECF No. 52-3; ECF No. 52-47.  In her deposition, McNeil could not recall any information wrongfully disclosed other than her job status.  McNeil Dep. 119:11– 121:15, ECF No. 46-20, Page ID 300–02.

In order to establish her *prima facie* case, McNeil must meet the disability claim[14] framework under *McDonnell Douglas*.  Thus, she must show that "(1) that [s]he

---

[14]    Although Claim V is captioned as "Retaliation", the Eighth Circuit has explained that allegations of adverse actions by an employer after the employee has exercised her FMLA rights is best characterized as a discrimination claim.  *Burciaga v. Ravago Americas LLC*, 791 F.3d 930, 934 (8th Cir. 2015) ("A [FMLA] discrimination claim occurs when 'an employer takes adverse action against an employee because the employee exercises rights to which [s]he is entitled under the FMLA.'" (quoting *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1006 (8th Cir. 2012)); *see Pulczinski*, 691 F.3d at 1006 (citing 29 C.F.R. § 825.220(c)) ("To distinguish the 'entitlement' claim under [29 U.S.C.]

engaged in activity protected under the Act; (2) that [s]he suffered a materially adverse employment action, and (3) that a causal connection existed between [her] action and the adverse employment action." *Burciaga v. Ravago Americas LLC*, 791 F.3d 930, 934 (8th Cir. 2015) (quoting *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1006 (8th Cir. 2012)).

The 8th Circuit has held, in the context of ADA discrimination based on illegal disclosure, a plaintiff "must establish a tangible injury caused by the alleged illegal disclosure." *Cossette v. Minnesota Power & Light*, 188 F.3d 964, 971 (8th Cir. 1999) (citing *Armstrong v. Turner Indus., Inc.*, 141 F.3d 554, 562 (5th Cir.1998); *Griffin v. Steeltek, Inc.*, 160 F.3d 591, 594–95 (10th Cir.1998)). "An adverse employment action is a tangible change in working conditions that produces a material employment disadvantage," such as "cuts in pay or benefits, and changes that affect an employee's future career prospects . . . ." *Wilkie*, 638 F.3d at 955 (quoting *Clegg*, 496 F.3d at 926). McNeil alleges no change whatsoever in working conditions caused by Jarrett's disclosure. Although McNeil was on leave at the time of the disclosure, there is no allegation or evidence presented that the disclosure affected her return to work or resulted in any injury whatsoever. For this reason summary judgment will be granted as to Claim V.

## VI. MOTIONS TO STRIKE

Both parties filed motions to strike portions of opposing evidence. ECF Nos. 57 & 62. For reasons already discussed, the Court will grant Union Pacific's Motion to Strike, ECF No. 57, so far as it concerns ¶ 11 of Anderson's declaration, ECF No. 52-2,

---

§ 2615(a)(1), and the 'retaliation' claim under § 2615(a)(2), we think it helpful to describe this sort of complaint as a 'discrimination' claim.").

because there is no indication the information is based on her personal knowledge. The remaining evidence identified by both motions was not material to the Court's conclusions, and the Court did not rely upon it. Except for the discussed portion of Anderson's declaration, the motions will be denied as moot.

## CONCLUSION

For the reasons stated above, the Motion for Summary Judgment will be granted, Union Pacific's motion to strike will be granted, in part, and McNeil's motion to strike will be denied as moot. Accordingly,

IT IS ORDERED:

1. Defendant Union Pacific Railroad Company's Motion for Summary Judgment, ECF No. 44, is granted;

2. Defendant Union Pacific Railroad Company's Motion to Strike, ECF No. 57, is granted, in part, as follows:

   a. The information contained in ¶ 11 of Anderson's declaration, ECF No. 52-48 is stricken; and

   b. the motion is otherwise denied, as moot;

3. Plaintiff Tasha McNeil's Motion to Strike, ECF No. 62, is denied, as moot;

4. The above-captioned action is dismissed, with prejudice;

5. Any other pending motions are denied, as moot; and

6. A separate judgment will be entered.


Dated this 21st day of May, 2018.


BY THE COURT:

s/Laurie Smith Camp
Chief United States District Judge